In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-2273

UNITED STATES OF AMERICA ex rel. CIMZNHCA, LLC,

*Plaintiff-Appellee,*

*v.*

UCB, INC., et al.,

*Defendants,*

Appeal of:

UNITED STATES OF AMERICA,

*Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:17-cv-00765-SMY-MAB — **Staci M. Yandle**, *Judge.*

ARGUED JANUARY 23, 2020 — DECIDED AUGUST 17, 2020

Before ROVNER, HAMILTON, and SCUDDER, *Circuit Judges.*

HAMILTON, *Circuit Judge.* The False Claims Act allows the United States government to dismiss a relator's qui tam suit over the relator's objection with notice and opportunity for a hearing. 31 U.S.C. § 3730(c)(2)(A). The Act does not indicate

how, if at all, the district court is to review the government's decision to dismiss. The D.C. Circuit has said not at all; the Ninth Circuit has said for a rational basis. Compare *Swift v. United States*, 318 F.3d 250 (D.C. Cir. 2003), with *United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139 (9th Cir. 1998). In this case, the district court said it agreed with the Ninth Circuit but applied something closer to administrative law's "arbitrary and capricious" standard and denied dismissal. The government has appealed. The relator contends we should either dismiss for want of appellate jurisdiction or affirm.

We find that we have jurisdiction and reverse. First, we interpret the Act to require the government to intervene as a party before exercising its right to dismiss under § 3730(c)(2)(A). We think it best, however, to construe the government motion here as a motion to both intervene and dismiss. This solves the jurisdictional problem without needing to create a new category of collateral-order appeals. On the merits, we view the choice between the competing standards as a false one, based on a misunderstanding of the government's rights and obligations under the False Claims Act. And by treating the government as seeking to intervene, which it should have been allowed to do, we can apply a standard for dismissal informed by Federal Rule of Civil Procedure 41.

I.  *Factual and Procedural Background*

In 1863, "a series of sensational congressional investigations" revealed that war-profiteering military contractors had billed the federal government for "nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed" the government's procurement efforts. *United States v. McNinch*, 356 U.S. 595, 599 (1958). In response,

Congress passed the False Claims Act, now codified at 31 U.S.C. §§ 3729–3733. The Act authorizes a private person, called a relator, to enforce its terms by filing suit "for the person and for the United States Government." § 3730(b)(1). Suits of this type were once so common that "[a]lmost every" penal statute could be enforced by them. *Adams v. Woods*, 6 U.S. (2 Cranch) 336, 341 (1805). Such suits are called "qui tam" suits, from a Latin tag meaning, "who as well for the lord king as for himself sues in this matter." If the relator's qui tam action is successful, she receives a portion of the recovery as a bounty; the lion's share goes to the government. § 3730(d).

The False Claims Act prohibits, among other acts, presenting to the government "a false or fraudulent claim for payment or approval." § 3729(a)(1)(A). One way to present a false claim is to present to a federal healthcare program a claim for payment that violates the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), which prohibits giving or receiving "remuneration" in return for such programs' business. See 42 U.S.C. § 1320a-7b(g) (violations of the Anti-Kickback Statute also violate the False Claims Act). For a limited liability company called Venari Partners, doing business as the "National Health Care Analysis Group," this law presented a business opportunity.

Venari Partners has four members (Sweetbriar Capital, LLC; 101 Partners, LLC; Min-Fam-Holding, LLC; and Uptown Investors, LP), themselves composed of one or two individual investors, six in total. Venari Partners formed eleven daughter companies, each for the single purpose of prosecuting a separate qui tam action. All eleven actions allege essentially identical violations of the False Claims Act via the Anti-

Kickback Statute by dozens of defendants in the pharmaceutical and related industries across the country.

The relator in this case is CIMZNHCA, LLC, one of those Venari companies. Its complaint, filed in 2017 in the Southern District of Illinois, alleges that defendants illegally paid physicians for prescribing or recommending Cimzia, a drug manufactured by defendant UCB, Inc. to treat Crohn's disease, to patients who received benefits under federal healthcare programs. The relator alleges that the illegal kickbacks took the form of free education services provided by nurses to physicians and their patients and free reimbursement support services, that is, assistance with insurance paperwork.

Once the relator filed this action, the government had the right "to intervene and proceed" as the plaintiff with the "primary responsibility" for prosecuting it. 31 U.S.C. §§ 3730(b)(2), 3730(c)(1). The government chose not to exercise that right. The False Claims Act also gives the government the right to dismiss the action over the relator's objection if the relator is provided notice and an opportunity for a hearing. § 3730(c)(2)(A). This right the government has sought to exercise. On December 17, 2018, the government filed a motion to dismiss, representing that it had investigated the Venari companies' claims, including CIMZNHCA's, and found them "to lack sufficient merit to justify the cost of investigation and prosecution and otherwise to be contrary to the public interest." The district court held a hearing on the government's motion and issued an opinion denying it.

The court considered first what standard of review applied to the government's motion under § 3730(c)(2)(A), which itself supplies none. The government urged adoption of the standard announced in *Swift v. United States*, 318 F.3d

250, 253 (D.C. Cir. 2003), which gives the government "unfettered" discretion to dismiss. Relator argued for the more demanding burden-shifting test announced in *United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139 (9th Cir. 1998). Under that test, the government must first identify a "valid government purpose" and then show "a rational relation between dismissal and accomplishment of the purpose." *Id.* at 1145. If the government does so, the burden shifts to the relator to show that "dismissal is fraudulent, arbitrary and capricious, or illegal." *Id.*

Reasoning that Congress would not command the hollow ritual of convening a hearing on a preordained outcome (no one deliberates about the fall of Troy, as Aristotle said), the district court concluded that *Sequoia Orange* supplied the proper standard. Deeming the government's general evaluation of the Venari companies' claims to be insufficient as to CIMZNHCA in particular, and hearing notes of mere "animus towards the relator" in the government's arguments, the court concluded further that the government's decision to dismiss was "arbitrary and capricious" and "not rationally related to a valid governmental purpose."

After the district court denied its motion to reconsider, the government took this appeal, pending which the district court proceedings have been stayed. Our jurisdiction is contested. On the merits, the government argues that *Swift*, not *Sequoia Orange*, supplies the proper standard and that it satisfied the Ninth Circuit's test in any event. Relator argues that *Swift* should be rejected and that the district court correctly applied *Sequoia Orange*. We conclude first that we have jurisdiction and second that the choice presented to us on the merits is a false one, though the correct answer lies much nearer to *Swift*

than *Sequoia Orange*. We reverse and remand with instructions to dismiss this action.

II. *Analysis*

A. *The False Claims Act*

We begin with an overview of the False Claims Act's most relevant provisions.[1] A qui tam action under the Act is brought "for the person and for the United States Government" and must be filed "in the name of the Government." 31 U.S.C. § 3730(b)(1). The relator may voluntarily dismiss the action "only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." *Id.*

The relator's complaint must be filed under seal and may not be served on the defendants until the court so orders. § 3730(b)(2). Upon filing, the relator must serve the government with a copy of the complaint and a "written disclosure of substantially all material evidence" in the relator's possession. *Id.* The government then has sixty days, *id.*, extendable for "good cause shown," § 3730(b)(3), to decide whether "to intervene and proceed with the action" while the complaint remains under seal. § 3730(b)(2). At the end of the seal period, "the Government shall (A) proceed with the action, in which case the action shall be conducted by the Government; or (B) notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action." § 3730(b)(4).

Before 1986, if the government intervened in the action, the relator's participation was at an end. In 1986, however,

---

[1] The text of 31 U.S.C. § 3730(b)–(c) is attached as an appendix to this opinion.

Congress amended the False Claims Act to allow for the relator's continued participation even after the government intervenes. Allowing two plaintiffs has given rise to a new set of tensions that the provisions at the heart of this case were designed to manage. See *Sequoia Orange*, 151 F.3d at 1143–44, citing *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 745 (9th Cir. 1993), among others. "If the Government proceeds with the action," it assumes "primary responsibility" for prosecuting it. § 3730(c)(1). The relator retains "the right to continue as a party to the action," but critically for our purposes, that right is "subject to the limitations set forth in paragraph (2)." *Id.*

The most relevant of these limits is the government's right to dismiss the action:

> The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion.

§ 3730(c)(2)(A). The other limits are the government's right to settle the action "notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances," § 3730(c)(2)(B); the government's right to seek a court order restraining the relator's abusive litigation conduct, § 3730(c)(2)(C); and the defendant's right to do the same. § 3730(c)(2)(D).

"If the Government elects not to proceed with the action," the relator "shall have the right to conduct the action." § 3730(c)(3). The relator's sole obligations to the government

thereafter are to supply it on request with copies of all pleadings and, at the government's expense, copies of all deposition transcripts. *Id.* The court may "nevertheless permit the Government to intervene at a later date upon a showing of good cause." *Id.* "Whether or not the Government proceeds with the action," the government may seek a stay of discovery if it would interfere with an ongoing investigation into the same facts. § 3730(c)(4). Finally, if the government elects to pursue "any alternate remedy" for the challenged conduct, the relator may not be cut out; she has "the same rights" in the alternate proceeding as in the qui tam action. § 3730(c)(5).

   B.  *Appellate Jurisdiction: Appeal from the Denial of a Motion to Intervene*

We must decide our jurisdiction first. *West v. Louisville Gas & Elec. Co.*, 920 F.3d 499, 503 (7th Cir. 2019). Ordinarily we have appellate jurisdiction of the district courts' final judgments under 28 U.S.C. § 1291 and a few categories of interlocutory orders under § 1292. Denials of motions to dismiss rarely fit into those categories, but the government argues here that the denial of its motion to dismiss under 31 U.S.C. § 3730(c)(2)(A) was a "collateral order," not a final judgment but by a "practical construction" of 28 U.S.C. § 1291 still a "final decision" within its terms. See *Ott v. City of Milwaukee*, 682 F.3d 552, 554 (7th Cir. 2012) (internal quotation marks omitted). We see no need to create a new category of appealable collateral orders. In substance, the government appeals a denial of what should be deemed a motion to intervene and then to dismiss. It is well established that denials of motions to intervene are appealable.

Collateral orders are orders that are final with respect to the issue they decide and important enough to be immediately appealable. *Mohawk Industries v. Carpenter*, 558 U.S. 100, 103 (2009), citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). Protecting the default rule of one appeal per case, however, means that the universe of appealable collateral orders "must remain narrow and selective in its membership." *Mohawk Industries*, 558 U.S. at 113, quoted in *Ott*, 682 F.3d at 555. The question is not whether the particular order is collateral but whether "the entire category" of orders to which it belongs is. *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.*, 707 F.3d 853, 868 (7th Cir. 2013), quoting *Mohawk*, 558 U.S. at 107.

This categorical analysis is difficult here because the type of order appealed here is very rare. In the history of the False Claims Act since 1986, the government tells us, only one other district court has denied its § 3730(c)(2)(A) motion to dismiss, which the Ninth Circuit recently declined to hold a collateral order.[2] The power of a non-party to force dismissal of another's lawsuit is otherwise unheard of in our law. See, e.g., Fed. R. Civ. P. 17(a)(3) (real party in interest must "ratify, join,

---

[2] *United States v. Academy Mortgage Corp.*, No. 3:16-cv-02120-EMC, 2018 WL 3208157, at *2–*3 (N.D. Cal. June 29, 2018), appeal dismissed sub nom. *United States ex rel. Thrower v. Academy Mortgage Corp.*, No. 18-16408, ___ F.3d ___, 2020 WL 4462130 (9th Cir. Aug. 4, 2020). The Ninth Circuit in *Thrower* rejected the government's argument that an order denying a motion to dismiss under 31 U.S.C. § 3730(c)(2)(A) is appealable as a collateral order. The *Thrower* court was not presented with and did not consider the possibility of treating the government's motion to dismiss as a motion both to intervene and to dismiss, as suggested in *Swift v. United States*, 318 F.3d 250, 252 (D.C. Cir. 2003), which is the path we follow in finding that we have jurisdiction over this appeal, as explained below.

or be substituted into" action brought on its behalf); *Minneapolis-Honeywell Regulator Co. v. Thermoco, Inc.*, 116 F.2d 845, 847 (2d Cir. 1941) (L. Hand, J.) ("[T]he companies could not make any motion unless they became parties … although they might … have combined a motion to intervene with a motion to dismiss.").

### 1. *Eisenstein, Footnote 2*

The government argues that the jurisdictional issue has already been resolved in its favor by *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928 (2009), the Supreme Court's most recent word on the relationship between the relator and the government in a qui tam case in which the government has declined to intervene. The holding of *Eisenstein* is that, absent intervention, the government is not a "party" for the purpose of determining applicable appeal deadlines. 556 U.S. at 937; see 28 U.S.C. § 2107(b) (deadline where United States is "party"); Fed. R. App. P. 4(a)(1)(B) (same). Along the way, the Court observed that, the government's non-party status notwithstanding, it need not intervene to appeal "any order" in a qui tam suit. 556 U.S. at 931 n.2. Rather, its immediate appeal would lie from the relator's voluntary dismissal of the case without the government's written consent. *Id.*, citing 31 U.S.C. § 3730(b)(1). And denials of motions to intervene have long been held immediately appealable. *Id.*, citing § 3730(c)(3).

The government maintains there is "no basis for distinguishing" *Eisenstein*'s examples from an order *denying* a motion to a dismiss under § 3730(c)(2)(A). But the bases are obvious: voluntary dismissal ends the case, and the immediate appealability of a denial of intervention is even older than the collateral-order doctrine announced in *Cohen*. See *Brotherhood*

*of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 524–25 (1947). Footnote 2 of *Eisenstein* does not stand for the proposition stated by the government. It nonetheless indicates the correct path to solving the jurisdictional problem: treat the government's motion to dismiss as a motion both to intervene and to dismiss.

### 2. *Intervention in Substance*

An intervenor comes between the original parties to ongoing litigation and interposes between them its claim, interest, or right, which may be adverse to either or both of them. See *Eisenstein*, 556 U.S. at 933; *Rocca v. Thompson*, 223 U.S. 317, 330–31 (1912). That is exactly what the government wants to do here. The government claims a superior right to dispose of this lawsuit between the relator and the defendants by ending it on terms it deems suitable. The relator holds the present statutory right "to conduct the action," 31 U.S.C. § 3730(b)(4)(B), as well as a partial congressional assignment of any resulting damages, *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000), both of which the government asserts the right to nullify. The defendants, as their pending motions to dismiss reveal, desire the finality of a dismissal with prejudice. The government asserts the right to deny defendants that finality by having the action dismissed with prejudice as to the relator but without prejudice as to it. In sum, the government wants a say—the final say—in conducting this lawsuit. The district court's order denying that wish is in substance an order denying a motion to intervene.

3.  *Intervention in Form*

There is another reason to construe for jurisdictional purposes the government's motion to dismiss as a motion to intervene and dismiss: it ought to have been filed that way to begin with. Cf. *Swift v. United States*, 318 F.3d 250, 252 (D.C. Cir. 2003) (if government were required to intervene before dismissing, "we could construe the government's motion to dismiss as including a motion to intervene").

As a matter of form, the government did not move to intervene before filing its motion to dismiss under § 3730(c)(2)(A). Several courts of appeals have expressly or tacitly endorsed its prerogative not to do so. *Chang v. Children's Advocacy Ctr. of Del.*, 938 F.3d 384, 386 (3d Cir. 2019); *Ridenour v. Kaiser-Hill Co.*, 397 F.3d 925, 933–34 (10th Cir. 2005); *Swift*, 318 F.3d at 251–52; *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 753 n.10 (9th Cir. 1993); see also *United States v. Everglades Coll., Inc.*, 855 F.3d 1279, 1285–86 (11th Cir. 2017) (settlements under § 3730(c)(2)(B)). These decisions did not address appeals of denials of dismissal, but adhering to them in this case of a denial would require in effect creation of a new category of appealable collateral orders. The Supreme Court has firmly discouraged that step. See *Mohawk*, 558 U.S. at 113–14.

There is a better solution. We read the False Claims Act as requiring the government to intervene before exercising any right under § 3730(c)(2). Accord, *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 519 (6th Cir. 2009) ("Section 3730(c)(2)(A) applies only when the government has decided to 'proceed[] with the action' and has assumed 'primary responsibility for prosecuting the action.'").

a. *Text and Structure of § 3730(c)*

To explain our solution of the jurisdictional problem, we begin with the statute's text. E.g., *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Subsection (c) of § 3730 bears the heading, "Rights of the parties to qui tam actions." One would thus expect subsection (c) to treat the rights of *parties* to qui tam actions, which the government is not unless and until "it intervenes in accordance with the procedures established by federal law." *Eisenstein*, 556 U.S. at 933. In fact, the structure of subsection (c) guides its proper interpretation as to which rights litigants possess under which procedural circumstances. See *Ortega v. Holder*, 592 F.3d 738, 743 (7th Cir. 2010) ("we must consider not only the words of the statute, but also the statute's structure."). Each paragraph of subsection (c)—except paragraph (2)—announces at its outset the procedural posture to which it applies. Paragraph (1) applies "If the Government proceeds with the action." Paragraph (3) applies "If the Government elects not to proceed with the action." Paragraph (4) applies "Whether or not the Government proceeds with the action." Paragraph (5) applies "Notwithstanding subsection (b)," that is, notwithstanding the relator's qui tam action altogether. Where, then, does paragraph (2) fit into this structure?

Nowhere, the D.C. Circuit answered in *Swift*. According to *Swift*, paragraph (2) is entirely free-floating; it is not "constrained by" and operates "independent[ly] of" the rest of subsection (c), including specifically paragraph (1). 318 F.3d at 252. There are several reasons to question this reading. First, it makes surplusage of paragraph (4)'s introductory phrase, "Whether or not the Government proceeds with the action." But see, e.g., *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339

(1979) (anti-surplusage canon); see also Antonin Scalia & Bryan A. Garner, *Reading Law* 156 (2012) ("Material within an indented subpart relates only to that subpart."). If the background assumption of subsection (c) were that each of its paragraphs applied no matter whether the government had intervened, Congress would not have specified that paragraph (4), and only paragraph (4), applies "Whether or not the Government proceeds with the action."

The *Swift* analysis also makes surplusage of the provision in paragraph (1) that a post-intervention relator has the right to continue as a party "subject to the limitations set forth in paragraph (2)." Again, if the government enjoyed its rights under paragraph (2) under all circumstances and in any posture, there would have been no reason to specify that the relator's continued participation as a party, and only the relator's continued participation as a party, is "subject to" paragraph (2).

Along these lines, § 3730(b)(4)(B) gives the relator "the right to conduct the action"—without qualification—when the government has declined to intervene. That phrase is picked up by paragraph (c)(3), which provides that, "If the Government elects not to proceed with the action," the relator "shall have the right to conduct the action," while reserving certain rights (to be served with copies of certain papers, to intervene later for good cause) to the government. Thus, when Congress wanted to qualify the relator's "right to conduct the action" absent intervention, it did so in paragraph (c)(3). It would be odd if the unqualified "right to conduct the action" in subparagraph (b)(4)(B) and the nearly unqualified "right to conduct the action" in paragraph (c)(3) were in fact the profoundly qualified right to conduct the action so long as the

government does not wish to have it dismissed or settled under subparagraphs (c)(2)(A) or (B)—neither of which even mentions the relator's "right to conduct the action."

So where does paragraph (2) best fit in? The second half of the paragraph plainly operates against the backdrop of government intervention. Specifically, subparagraph (C) provides for "limitations" on the relator's participation where its "unrestricted participation … would interfere with or unduly delay *the Government's prosecution* of the case." (Emphasis added.) Similarly, subparagraph (D) provides that the relator's "participation" may be "limit[ed]" where its "unrestricted participation" would harass or unduly burden the defendant. Obviously a defendant cannot "restrict the participation" of its sole adversary in a lawsuit. We find subparagraph (D) even more telling than subparagraph (C) for our purposes because subparagraph (C) makes the government's participation explicit while subparagraph (D) tacitly assumes it—suggesting that so too does the rest of paragraph (2).

We conclude that paragraph (2) fits in best right where paragraph (1) puts it: as a limit on the right of the relator to continue as a party after the government has intervened. It can have no other independent operation without disrupting the structure of the statute as a whole. *Swift* reasoned that, to justify this reading, "either § 3730(c)(2) would have to be a subsection of § 3730(c)(1)—which it is not—or § 3730(c)(2) would have to contain language stating that it is applicable only in the context of § 3730(c)(1)—which it does not." 318 F.3d at 252. The first minor premise, that paragraph (c)(2) is not a subsection of paragraph (c)(1), is true as a typographic matter but otherwise fails to capture how the five paragraphs of subsection (c) relate to one another in text and logic. As our

premises differ, so too does our conclusion: paragraph (c)(2) is better read to operate only "If the Government proceeds with the action." § 3730(c)(1).

The remaining arguments advanced by *Swift* and cases adopting its reading against a need for intervention to dismiss are not persuasive. First, *Swift* neutered the binary choice put to the government by Congress—intervene, § 3730(b)(4)(A), or decline, § 3730(b)(4)(B)—by finding a third way to dismiss without intervention under § 3730(c)(2)(A). From the provision that the government "may elect to intervene *and proceed* with the action," § 3730(b)(2), the court reasoned that "[e]nding the case by dismissing it is not proceeding with the action; to 'proceed with the action' means … that the case will go forward with the government running the litigation." 318 F.3d at 251. Accord, *Everglades Coll., Inc.*, 855 F.3d at 1285 (settlement under § 3730(c)(2)(B)); *Ridenour*, 397 F.3d at 933.

In our view, this awkward reading of the provision is not the better reading. "Proceeding" in the litigation context is chiefly defined as "the regular and orderly progression of a lawsuit." *Proceeding*, Black's Law Dictionary (4th ed. 2011). We find no support in *Swift* or elsewhere for the proposition that the regular and orderly progression of a lawsuit requires litigating to favorable judgment or involuntary dismissal, to the exclusion of voluntary dismissal, particularly upon settlement. If "proceed" were understood that way, how much litigating would the government have to do before it could then dismiss without running afoul of the command to "proceed"? This reading of "proceed" suggests further that "electing not to proceed" would include electing to dismiss voluntarily. That cannot be right because paragraph (c)(3) gives the relator "the right to conduct the action" where "the Government

elects not to proceed with the action." One cannot "conduct" a lawsuit that has been dismissed.

  b.  *Serious Constitutional Doubts?*

Second, the Tenth Circuit in *Ridenour*, invoking the Take Care Clause of Article II, § 3, and the constitutional-doubt canon of statutory interpretation, see *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001), rejected the reading we adopt here in part because "to condition the Government's right … to dismiss an action in which it did not initially intervene upon a requirement of … good cause [under § 3730(c)(3)] would place the FCA on constitutionally unsteady ground" by "unnecessarily bind[ing] the Government." 397 F.3d at 934; see also *Kelly*, 9 F.3d at 753 n.10 (because statute does not "prohibit[]" it, interpretation allowing dismissal without intervention is "entirely appropriate" as illustration of "meaningful [executive] control" over relators' FCA suits). Respectfully, we do not find constitutional doubt a sound reason to follow this path.

The canon of constitutional doubt teaches that when two interpretations of a statute are "fairly possible," one of which raises a "serious doubt" as to the statute's constitutionality and the other does not, a court should choose the interpretation "by which the question may be avoided." *Zadvydas*, 533 U.S. at 689; see *United States ex rel. Att'y General v. Del. & Hudson Co.*, 213 U.S. 366, 407–08 (1909). The canon does *not* hold that any reading of a statute not expressly "prohibited" must be adopted if it will relieve the executive of any burden of undefined weight which the judiciary deems without analysis to be "unnecessary." But that is how the canon was applied in *Ridenour* and *Kelly*. In our view, this analysis is misguided for two reasons. First, it indulges every presumption in favor of

the statute's invalidity rather than its validity. Second, it simply does not show that the False Claims Act is in serious danger of unconstitutionality unless dismissal under § 3730(c)(2)(A) applies only after the government has declined to intervene.

First, *Ridenour* and *Kelly* inverted the constitutional-doubt canon, and constitutional avoidance principles generally, by creating constitutional problems in one section of a statute to solve them in a different section of the statute. "Good cause" is a uniquely flexible and capacious concept. See *Good Cause*, s.v. *Cause*, Black's Law Dictionary (4th ed. 2011) ("A legally sufficient reason."). But neither *Ridenour* nor *Kelly* offered an interpretation of what constitutes "good cause" under § 3730(c)(3). Neither acknowledged the variety of situations calling for that decision.[3] Both assumed without analysis that any "good cause" requirement would tend to fetter the executive unconstitutionally—neglecting, at minimum, the possibility that avoiding offense to the separation of powers in a case that actually risks it would itself weigh heavily in any "good cause" determination.

---

[3] For example, the Article II implications of denying good cause to intervene could vary widely. Compare a case where the government seeks to dismiss at an early stage because it has consistently held the challenged conduct to be lawful and desirable, to a case where the government seeks to dismiss on the eve of trial of meritorious claims only to protect a high-ranking executive official's private business interests. See *Yick Wo v. Hopkins*, 118 U.S. 356, 372–74 (1886), cited by *Heckler v. Chaney*, 470 U.S. 821, 838 (1985); see also Andrew Kent et al., *Faithful Execution and Article II*, 132 Harv. L. Rev. 2111 (2019) (original public meaning of duty to "faithfully execute" was "fiduciary").

Both decisions thus defaulted to the most constitutionally offensive reading of § 3730(c)(3) rather than the least. Both thereby created rather than avoided doubtful questions of constitutional law, which then required "solving" by doubtful interpretation of § 3730(c)(2)(A). Our duty, though, is to indulge "[e]very presumption … in favor of the validity of the statute." *Graves v. Minnesota*, 272 U.S. 425, 428 (1926). Our reading of § 3730(c)(2)(A), by contrast, presumes § 3730(c)(3) is valid on its face and simply defers consideration of genuine constitutional concerns until they ripen in a specific context and are thus more properly presented for decision. See *Ashwander v. T.V.A.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).

Second, because neither *Ridenour* nor *Kelly* offered an account of what "good cause" requires nor of what Article II requires in relation to "good cause" dismissals, neither decision raises a serious possibility that the constitutionality under Article II of the False Claims Act depends on a particular construction of § 3730(c)(2)(A). As a general matter, the Supreme Court has reserved decision on the constitutionality under Article II of qui tam actions. *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 778 n.8 (2000). Their ancient pedigree, however, together with their widespread use at the time of the Founding, suggests that the False Claims Act as a whole is not in imminent danger of unconstitutionally usurping the executive power. See *id.* at 774–77 ("originated around the end of the 13th century"); *Marvin v. Trout*, 199 U.S. 212, 225 (1905) ("in existence for hundreds of years in England, and in this country ever since the foundation of our government"); *Adams v. Woods*, 6 U.S. (2 Cranch) 336, 341 (1805) (Marshall, C.J.) ("Almost every fine or forfeiture under a penal statute, may be recovered by an action of debt [qui tam]."); 3

William Blackstone, Commentaries *160 (Forfeitures created
by penal statutes "more usually  are given at large, to any
common informer; or … to the people in general … . [I]f any
one hath begun a *qui tam*, or *popular*, action, no other person
can pursue it; and the verdict passed upon the defendant …
is … conclusive even to the king himself."). Indeed, a common
function of qui tam actions, and one of the earliest, has been
to regulate the exercise of executive power itself. Randy Beck,
*Qui Tam Litigation Against Government Officials*, 93 Notre Dame
L. Rev. 1235, 1260–61 (2018) (discussing Statute of York 1318,
12 Edw. 2); *id.* at 1269–1304 (early American use of such qui
tam actions).

While reserving decision on the Article II consequences, as
a matter of statutory interpretation, *Stevens* rejected an agency
theory of the government-relator relationship under the False
Claims Act: "to say that the relator here is simply the statuto-
rily designated agent of the United States, in whose
name … the suit is brought … is precluded … by the fact that
the statute gives the relator himself an interest *in the lawsuit*."
529 U.S. at 772 (some emphasis omitted). That interest is re-
flected in the rights retained by the relator even after the gov-
ernment has intervened. *Id.*, citing § 3730(c)(1), (c)(2)(A), &
(c)(2)(B). It is reflected as well in "the right to conduct the ac-
tion" that indisputably belongs to the relator once the govern-
ment declines to intervene and can be wrested from the rela-
tor later only on a showing of good cause. § 3730(b)(4)(B) &
(c)(3). That right includes, for example, the right to choose
which claims to pursue, the right to engage the machinery of
discovery, and the right to settle claims without government
oversight (excepting the government's veto power under
§ 3730(b)(1) if the settlement is entered as a voluntary dismis-
sal, though it need not be).

We are not persuaded that a serious marginal risk of un-constitutionality is created by including dismissal in the list of powers reclaimable by the government only for good cause. The power to terminate the action is simply part of the power "to conduct the action." See Fed. R. Civ. P. 41(a); see also *Kelly*, 9 F.3d at 754 & n.14 ("[O]nce prosecution has been initiated, the government has greater authority to … ultimately *end* the litigation in a qui tam action than it does in an independent counsel's action;" true no matter whether § 3730(c)(2)(A) requires intervention), applying *Morrison v. Olson*, 487 U.S. 654 (1988). The government's automatic intervention rights during the seal period are themselves extendable only for "good cause," § 3730(b)(3), and even in criminal cases, the government must have "leave of court" to dismiss the prosecution. Fed. R. Crim. P. 48(a); *Rinaldi v. United States*, 434 U.S. 22, 29–32 (1977). Accordingly, we do not see a serious possibility that the constitutionality of the False Claims Act will stand or fall on a requirement that the government show good cause to intervene and dismiss after its automatic intervention rights have expired.

We have warned before that the constitutional-doubt canon "must be used with care, for it is a closer cousin to invalidation than to interpretation. It is a way to enforce the constitutional penumbra." *United States v. Marshall*, 908 F.2d 1312, 1318 (7th Cir. 1990) (en banc); see also Richard A. Posner, *The Federal Courts* 285 (1985) (The canon "enlarge[s] the … reach of constitutional prohibition … to create a … 'penumbra' that has much the same prohibitory effect as the … Constitution itself.").

The application of the canon in *Ridenour* and *Kelly* illustrates this warning. The canon can produce a hazy penumbra

of quasi-constitutional law that is used to limit legislative power when statutes are construed, without constitutional adjudication of a concrete case or controversy, to exclude all "unnecessar[y]" executive restrictions and to require all "entirely appropriate" executive prerogatives. See *Ridenour*, 397 F.3d at 934; *Kelly*, 9 F.3d at 753 n.10.

Our task is not to chip away at the legislation under the guise of interpreting it until every conceivable constitutional concern is assuaged. See *Salinas v. United States*, 522 U.S. 52, 59–60 (1997), citing among others *United States v. Albertini*, 472 U.S. 675, 680 (1985). Our task is to apply the Act until a party with standing convinces us or the Supreme Court that to do so would be unconstitutional. The constitutional-doubt canon can be used to resolve genuine doubts when the language is ambiguous and the constitutional danger clear and present. *Marshall*, 908 F.2d at 1318. It should not be used where, as here, the constitutional questions are more dubious than the statutory text. Statutory clarity should not yield to penumbral obscurity.

In sum, we treat the government's motion to dismiss as a motion both to intervene and then to dismiss under § 3730(c)(3) because intervention was in substance what the government sought and in form what the False Claims Act requires. Cf. *Swift*, 318 F.3d at 252 ("[I]f there were such a requirement, we could construe the government's motion to dismiss as including a motion to intervene."). The Supreme Court in *Eisenstein* could not "disregard" the "congressional assignment of discretion" to the government to intervene under the Act by treating the government as a party "even after it has declined to assume the rights and burdens attendant to full party status." 556 U.S. at 933–34. Neither will we. The

government cannot eat its cake and have it too. If the government wishes to control the action as a party, it must intervene as a party, as provided for by Congress.

Having concluded that the government's case for dismissal was not even rational, the district court here has necessarily expressed its view on the government's lack of "good cause" to intervene under the Act. Accordingly, we have jurisdiction over the appeal of what amounted to an order denying a motion to intervene. E.g., *Planned Parenthood of Wis., Inc. v. Kaul*, 942 F.3d 793, 796–97 (7th Cir. 2019). We may proceed to the merits.

C.  *Merits: The Government Was Entitled to Dismissal*

Treating the government as having sought to intervene solves the jurisdictional problem and offers a standard on the merits of dismissal, in the absence of a specific standard in 31 U.S.C. § 3730(c)(2)(A). The standard is that provided by the Federal Rules of Civil Procedure, as limited by any more specific provision of the False Claims Act and any applicable background constraints on executive conduct in general. In this case, no such substantive limits apply, so the Rules are the beginning and the end of our analysis.

Federal Rule of Civil Procedure 41(a)(1)(A)(i) provides that "the plaintiff may dismiss an action" by serving a notice of dismissal any time "before the opposing party serves either an answer or a motion for summary judgment." Dismissal is without prejudice unless the notice states otherwise. Fed. R. Civ. P. 41(a)(1)(B). This right is "absolute." *Marques v. Federal Reserve Bank of Chi.*, 286 F.3d 1014, 1017 (7th Cir. 2002). "[O]ne doesn't need a good reason, or even a sane or any reason" to

serve notice under the Rule, *id.*, and the notice is self-executing and case-terminating. *Id.* at 1018; *Smith v. Potter*, 513 F.3d 781, 782–83 (7th Cir. 2008). In other words, once a valid Rule 41(a) notice has been served, "the case [is] gone; no action remain[s] for the district judge to take," and her further orders are void. *Smith*, 513 F.3d at 782–83. Here, the government filed its "motion to dismiss" before the defendants had answered or moved for summary judgment, seeking dismissal without prejudice as to it and with prejudice as to the relator. It does not matter that the paper was labeled a "motion" rather than a "notice." *Id.* at 782. That looks like the end of the case, on terms of the government's choosing.

Actually, that was *almost* the end of the case because the provisions of Rule 41(a) are "[s]ubject to … any applicable federal statute." Fed. R. Civ. P. 41(a)(1)(A). By itself, Rule 41(a) provides that "the plaintiff may dismiss an action," *id.*, which obviously does not authorize an intervenor-plaintiff to effect involuntary dismissal of the original plaintiff's claims. See *Washington Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir. 1990). But § 3730(c)(2)(A) provides otherwise. Picking up the language of Rule 41, the statute provides: "The Government may dismiss the action" without the relator's consent if the relator receives notice and opportunity to be heard. § 3730(c)(2)(A). This procedural limit is the only authorized statutory deviation from Rule 41. Cf. § 3730(c)(2)(B) (authorizing settlement without relator's consent only "if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances"). Nor, because § 3730(c)(2)(A) twice refers to the government's "motion," should the statute be construed to eliminate the right to dismiss under the first half of Rule 41(a), whose language it mirrors. See *Adams v. Woods*, 6

U.S. (2 Cranch) 336, 337, 341 (1805) (Marshall, C.J.) (where statute of limitations provided that no person shall be "*prosecuted, tried or punished* … for *any* fine or forfeiture …, unless the *indictment or information*" was filed within two years, statute was construed to bar actions of debt qui tam: otherwise "a distinct member of the sentence … would be rendered almost totally useless"). Here, the relator received notice and took its opportunity to be heard. Once these had been accomplished, that should have been the end of the case.

This conclusion may seem counterintuitive. The law does not require the doing of a useless thing. *Mashi v. I.N.S.*, 585 F.2d 1309, 1314 (5th Cir. 1978). What, then, is the purpose of the statute's additional process if the government's litigation right is absolute and there is no substantive standard to apply? Congress sometimes demands that parties to a nascent legal dispute simply "communicate in some way" to attempt to resolve the dispute without court action, and there the judicial role is confined to ensuring that the communication has in fact taken place on the terms specified by statute. *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 494 (2015) (Title VII conciliation); cf. Fed. R. Civ. P. 26(c)(1) (parties must confer or attempt to confer before seeking court order on discovery dispute); Fed. R. Civ. P. 37(a)(1) (same). In such cases, however, the court is not called upon to serve as a mere convening authority—"and perhaps," as the district judge put it here, "serve you some donuts and coffee"—while the parties carry on an essentially private conversation in its presence. Like the district court, we find unpersuasive *Swift*'s suggestion that "the function of a hearing when the relator requests one is simply to give the relator a formal opportunity to convince the government not to end the case." 318 F.3d at 253.

Not every case, though, will be like this one. For example, if the conditions of Rule 41(a)(1) do not apply, "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). Thus, if the government's chance to serve notice of dismissal has passed, see Fed. R. Civ. P. 41(a)(1)(A)(i), and the relator by hypothesis refuses to agree to dismissal, see Fed. R. Civ. P. 41(a)(1)(A)(ii), then a hearing under § 3730(c)(2)(A) could serve to air what terms of dismissal are "proper." Cf. *Swift*, 318 F.3d at 252–53.

Further, there are always background constraints on executive action, even in the quasi-prosecutorial context of qui tam actions and the decisions to dismiss them. *Heckler v. Chaney*, 470 U.S. 821 (1985), cited by the government here, is not to the contrary. *Heckler* held that an administrative agency's decision not to take certain "investigatory and enforcement actions" had been "committed to agency discretion by law" and was thus not subject to judicial review under the Administrative Procedure Act. 470 U.S. at 824, 838; see 5 U.S.C. § 701(a)(2).

*Heckler* is an imperfect fit for the False Claims Act because the Court relied in part on the fact that "when an agency refuses to act it generally does not exercise its coercive power over an individual's liberty or property rights." 470 U.S. at 832 (emphasis omitted). That is not the case when the government dismisses a relator's action under the False Claims Act because "the statute gives the relator himself an interest *in the lawsuit*" as well as a partial assignment of the government's damages. *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772, 773 (2000); cf. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428–430 (1982) (Due Process Clause

protects causes of action); *id.* at 438 (Blackmun, J., concurring for four Justices) (same for Equal Protection Clause).

More important, *Heckler* reserved decision on what result would follow if there were a "colorable claim … that the agency's refusal to institute proceedings violated any constitutional rights" of the plaintiffs. 470 U.S. at 838. Its accompanying citation to *Yick Wo v. Hopkins* suggests the limits of executive nonenforcement decisions:

> [E]nforcing these notices may … bring ruin to … those against whom they are directed, while others, from whom they are withheld, may be actually benefited by what is thus done to their neighbors; and, when we remember that this action of non-action may proceed from enmity or prejudice, from partisan zeal or animosity, from favoritism and other improper influences …, it becomes unnecessary to suggest … the injustice capable of being wrought.

118 U.S. 356, 373 (1886); see *Heckler*, 470 U.S. at 839 (Brennan, J., concurring) ("It is possible to imagine other nonenforcement decisions made for entirely illegitimate reasons, for example, … in return for a bribe.").

In this light, *Sequoia Orange* may be read to hold no more than that the government's § 3730(c)(2)(A) dismissal may not violate the substantive component of the Due Process Clause. Demanding "no greater justification … than is mandated by the Constitution itself," *Sequoia Orange* equated its rational-relation test to the test used to determine "whether executive action violates substantive due process." 151 F.3d at 1145, 1146. *Swift* rejected as contrary to *Heckler* the *Sequoia Orange*

point that "arbitrary or irrational" decisions not to prosecute could violate due process, 318 F.3d at 253, but *Heckler* does not warrant such a strong statement. See *Yick Wo*, 118 U.S. at 370 (no room "for the play and action of purely personal and arbitrary power"). In arguing a similar case before the Ninth Circuit,[4] the government suggested that its § 3730(c)(2)(A) dismissal may not violate the Equal Protection Clause. See *Oyler v. Boles*, 368 U.S. 448, 456 (1962). Before this court, the government suggested, and even *Swift* entertained the possibility of, review for fraud on the court. See 318 F.3d at 253. We agree in principle with both suggestions, though we hope that these generous limits would be breached rarely if ever. We say only that in exceptional cases they could supply grist for the hearing under § 3730(c)(2)(A).

Not in this case, though. Wherever the limits of the government's power lie, this case is not close to them. At bottom, the district court faulted the government for having failed to make a particularized dollar-figure estimate of the potential costs and benefits of CIMZNHCA's lawsuit, as opposed to the more general review of the Venari companies' activities undertaken and described by the government. No constitutional or statutory directive imposes such a requirement. None is found in the False Claims Act. The government is not required to justify its litigation decisions in this way, as though it had to show "reasoned decisionmaking" as a matter of administrative law, as in, for example, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51–52 (1983).

We must disagree with the suggestion that the government's decision here fell short of the bare rationality standard

---

[4] See n.2, supra.

borrowed by *Sequoia Orange* from substantive due process cases. "[T]he Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression," and "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (internal quotation marks and alterations omitted); see also *Yick Wo*, 118 U.S. at 369–70 ("[O]ur institutions of government … do not mean to leave room for the play and action of purely personal and arbitrary power."). Executive action is not due process of law when it "shocks the conscience;" when it "offend[s] even hardened sensibilities;" or when it is "too close to the rack and the screw to permit of constitutional differentiation." *Rochin v. California*, 342 U.S. 165, 172 (1952).

The government proposed to terminate this suit in part because, across nine cited agency guidances, advisory opinions, and final rulemakings, it has consistently held that the conduct complained of is probably lawful. Not only lawful, but beneficial to patients and the public. As the government argued in the district court, "These relators"—created as investment vehicles for financial speculators—"should not be permitted to indiscriminately advance claims on behalf of the government against an entire industry that would undermine … practices the federal government has determined are … appropriate and beneficial to federal healthcare programs and their beneficiaries." This is not government irrationality. It oppresses no one and shocks no one's conscience.[5]

---

[5] At the hearing, the government cited the following: Medicare and State Health Care Programs, HHS Final Rule, 81 Fed. Reg. 88,368 (Dec. 7, 2016); Special Fraud Alert, HHS Notice, 79 Fed. Reg. 40,115 (July 11, 2014); Medicare and State Health Care Programs, HHS Final Rule, 78 Fed. Reg. 79,202

Accordingly, where the government's conduct does not bump up against the Rules, the statute, or the Constitution, the notice and hearing under § 3730(c)(2)(A) serve no great purpose. But that will not be true in every case. Our reading of § 3730(c)(2)(A) does not render its process futile as a general matter. Rather, this particular relator simply had no substantive case to make at the hearing to which the statute entitled it. Whenever a party has the right to invoke the court's aid, it has the obligation to do so with at least a non-frivolous expectation of relief under the governing substantive law. Fed. R. Civ. P. 11(b). That is not always possible, but that does not make the right meaningless.

In any event, the danger that the § 3730(c)(2)(A) hearing may often serve little purpose does not justify imposing on the government in each case the burden of satisfying *Sequoia Orange*'s "two-step test" before the burden is put back on the relator to show unlawful executive conduct. 151 F.3d at 1145; cf. *United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("in the absence of clear evidence to the contrary," courts presume regularity of prosecutorial decision-making). Nor does a Senate report on an unenacted version of the 1986 amendments frame a proper standard for § 3730(c)(2)(A) dismissals where Congress itself has supplied none in the enacted statute. See *Swift*, 318 F.3d at 253, discussing S. Rep. No. 99-345, at 26

(Dec. 27, 2013); OIG Advisory Op. No. 12-20, HHS, 2012 WL 7148096 (Dec. 12, 2012); OIG Advisory Op. No. 12-10, HHS, 2012 WL 4753657 (Aug. 23, 2012); OIG Compliance Program Guidance for Pharmaceutical Manufacturers, HHS Notice, 68 Fed. Reg. 23,731 (May 5, 2003); OIG Advisory Op. No. 00-10, HHS, 2000 WL 35747420 (Dec. 15, 2000); Publication of OIG Special Fraud Alerts, HHS Notice, 59 Fed. Reg. 65,372 (Dec. 19, 1994); Medicare and State Health Care Programs, HHS Final Rule, 56 Fed. Reg. 35,952 (July 29, 1991).

(1986). If Congress wishes to require some extra-constitutional minimum of fairness, reasonableness, or adequacy of the government's decision under § 3730(c)(2)(A), it will need to say so. See § 3730(c)(2)(B).

Two final matters relating to § 3730(c)(3). First, because we have construed the government's motion to dismiss as a motion to intervene and dismiss for both jurisdictional and merits purposes, it might be thought proper to remand the case for the district court to consider the government's "good cause" to intervene under § 3730(c)(3). We see no need for a further hearing here because the proper outcome is clear. In light of the government's unrestricted substantive right under Rule 41(a) and the absence of countervailing factors, such as fairness to the relator or conservation of judicial resources (likely not factors in any case at an early enough stage for Rule 41(a)(1)(A)(i) to apply), we see no basis for denying intervention here. A denial would be an abuse of discretion, so we need not remand for that purpose. *United States v. Ford*, 627 F.2d 807, 811 (7th Cir. 1980).

Second, because § 3730(c)(3) instructs the district court not to "limit[] the status and rights" of the relator when permitting the government to intervene, it might be argued that § 3730(c)(1) and (2) do not apply when the government intervenes under § 3730(c)(3). Presumably in such cases the government would be treated as an ordinary Rule 24(b) intervenor-plaintiff with the same rights as the original plaintiff. See 7C Charles Alan Wright, Arthur R. Miller, et al., *Federal Practice and Procedure* § 1920 (3d ed. 1998 & supp. 2019). But intervention is already given to the government on basically identical terms under Rule 24(b)(2). There is no need to construe § 3730(c)(3) so that it would add nothing. We find it unlikely

that Congress meant to introduce a new configuration of the government-relator relationship (that is, as co-equal plaintiffs) in an ancillary provision without otherwise providing for its terms in § 3730(c). See *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not hide "elephants in mouseholes"). The better reading is that § 3730(c)(3) instructs the district court not to limit the relator's "status and rights" as they are defined by §§ 3730(c)(1) and (2). Thus, the government cannot gain an advantage by intervening after the seal period; the relator cannot gain an advantage by engaging in gamesmanship or delay during the seal period.

The decision of the district court is REVERSED and the case is REMANDED with instructions to enter judgment for the defendants on the relator's claims under the False Claims Act, dismissing those claims with prejudice as to the relator and without prejudice as to the government.

*Appendix: 31 U.S.C. § 3730(b)–(c)*

(b) Actions by Private Persons.—(1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

(2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

(3) The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). Any such motions may be supported by affidavits or other submissions in camera. The defendant shall not be required to respond to any complaint filed under this section until 20 days after the complaint is unsealed and served upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure.

(4) Before the expiration of the 60-day period or any extensions obtained under paragraph (3), the Government shall—

(A) proceed with the action, in which case the action shall be conducted by the Government; or

(B) notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action.

(5) When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.

(c) Rights of the Parties to Qui Tam Actions.—(1) If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to continue as a party to the action, subject to the limitations set forth in paragraph (2).

(2)(A) The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion.

(B) The Government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances. Upon a showing of good cause, such hearing may be held in camera.

(C) Upon a showing by the Government that unrestricted participation during the course of the litigation by the person initiating the action would interfere with or unduly delay the Government's prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment, the court

may, in its discretion, impose limitations on the person's participation, such as—

 (i) limiting the number of witnesses the person may call;

 (ii) limiting the length of the testimony of such witnesses;

 (iii) limiting the person's cross-examination of witnesses; or

 (iv) otherwise limiting the participation by the person in the litigation.

(D) Upon a showing by the defendant that unrestricted participation during the course of the litigation by the person initiating the action would be for purposes of harassment or would cause the defendant undue burden or unnecessary expense, the court may limit the participation by the person in the litigation.

(3) If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action. If the Government so requests, it shall be served with copies of all pleadings filed in the action and shall be supplied with copies of all deposition transcripts (at the Government's expense). When a person proceeds with the action, the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause.

(4) Whether or not the Government proceeds with the action, upon a showing by the Government that certain actions of discovery by the person initiating the action would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts, the court

may stay such discovery for a period of not more than 60 days. Such a showing shall be conducted in camera. The court may extend the 60-day period upon a further showing in camera that the Government has pursued the criminal or civil investigation or proceedings with reasonable diligence and any proposed discovery in the civil action will interfere with the ongoing criminal or civil investigation or proceedings.

(5) Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section. Any finding of fact or conclusion of law made in such other proceeding that has become final shall be conclusive on all parties to an action under this section. For purposes of the preceding sentence, a finding or conclusion is final if it has been finally determined on appeal to the appropriate court of the United States, if all time for filing such an appeal with respect to the finding or conclusion has expired, or if the finding or conclusion is not subject to judicial review.

SCUDDER, *Circuit Judge*, concurring in the judgment. I agree with the majority's analysis of the jurisdictional question and bottom-line conclusion. But because I prefer to decide the government's challenge to the district court's denial of its motion to dismiss on narrower grounds, I concur in the judgment.

The majority opinion rightly observes that Section 3730(c)(2)(A) of the False Claim Act is an odd provision. It is strange to grant the government broad dismissal authority but then condition any dismissal on the district court holding a hearing (to allow a relator to voice objections) that leads to no judicial review. The oddity of that outcome contributes to the difficulty of landing on the right answer to the question of statutory construction analyzed in depth in the majority opinion.

What I am more confident saying is that this appeal does not require us to answer the question. We can (and should) resolve this case without deciding whether the D.C. Circuit got it right in holding that Section 3730(c)(2)(A) confers unfettered discretion upon the government to dismiss a *qui tam* action or instead whether the Ninth Circuit has the better end of the reasoning in requiring a dismissal decision to survive rational basis review. Compare *Swift v. United States*, 318 F.3d 250 (D.C. Cir. 2003), with *United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139 (9th Cir. 1998). Even under the Ninth Circuit's standard, the government's dismissal request easily satisfied rational basis review, and the district court committed error concluding otherwise. See *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993) (underscoring that the rational basis standard requires "a paradigm of judicial restraint" and indeed ruling

out "every conceivable basis" otherwise supporting the challenged measure).

I would stop there. While the majority opinion contains a sophisticated discussion of whether principles of constitutional avoidance should play any role in a question of statutory interpretation under the False Claims Act, I would rather confront that question in a case where the outcome hinged on the answer. In my respectful view, the narrower ground is the best ground to stand on to resolve this appeal.