# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 7, 2021

Lyle W. Cayce
Clerk

————————

No. 19-40906

————————

United States of America, Ex Rel., Health Choice Alliance, L.L.C., *on behalf of* United States of America and 31 States (AR; CA; CO; CT; DE; DC; FL; GA; HI; IL; IN; IA; LA; MD; MA; MI; MN; MT; NV; NH; NJ; NM; NY; NC; OK; RI; TN; TX; VT; VA; WA),

*Plaintiffs—Appellants*,

*versus*

Eli Lilly and Company, Incorporated; VMS BioMarketing; Covance, Incorporated; United BioSource Corporation; HealthSTAR Clinical Education Solutions, L.L.C.; Covance Market Access Services, Incorporated,

*Defendants—Appellees*,

United States of America,

*Appellee*,

_____

United States of America, Ex Rel., Health Choice Group, L.L.C., *on behalf of* United States of America and 31 States (AR; CA; CO; CT; DE; DC; FL; GA; HI; IL; IN; IA; LA; MD; MA; MI; MN; MT; NV; NH; NJ; NM; NY; NC; OK; RI; TN; TX; VT; VA; WA),

No. 19-40906

*Plaintiff—Appellant,*

*versus*

BAYER CORPORATION; AMGEN, INCORPORATED; ONYX
PHARMACEUTICALS, INCORPORATED; AMERISOURCEBERGEN
CORPORATION; LASH GROUP,

*Defendants—Appellees,*

UNITED STATES OF AMERICA,

*Appellee.*

---

Appeals from the United States District Court
for the Eastern District of Texas
USDC No. 5:17-CV-123
USDC No. 5:17-CV-126

---

Before HIGGINBOTHAM, ELROD, and HAYNES, *Circuit Judges.*
JENNIFER WALKER ELROD, *Circuit Judge*:[*]

The appellants Health Choice Alliance and Health Choice Group brought *qui tam* actions under the False Claims Act on behalf of the United States alleging violations of the Anti-Kickback Statute by pharmaceutical companies. The United States moved to dismiss the actions, and the district court granted the motion. Because the actions were properly dismissed, we AFFIRM.

I.

Health Choice Alliance and Health Choice Group (collectively Health Choice) are both entities created by the National Health Care Analysis Group

---

[*] Judge Haynes concurs in the judgment only.

No. 19-40906

for the purpose of filing *qui tam* actions alleging instances of fraud in medicine and pharmaceuticals. Health Choice and affiliated entities brought eleven *qui tam* actions under the False Claims Act against a total of thirty-eight defendants alleging similar violations of the Anti-Kickback Statute. 31 U.S.C. § 3730(b); 42 U.S.C. § 1320a-7b(b). This appeal concerns two of those *qui tam* cases, against Eli Lilly and Company and Bayer Corporation.[1] The complaints in both the Eli Lilly and Bayer cases allege that the defendants illegally provided patient-education services to providers before a prescription had been written in violation of the Anti-Kickback Statute and certain state laws.

Health Choice filed two similar complaints against Eli Lilly and (initially) four other defendants and against Bayer and four other defendants

---

[1] The nine cases which are not at issue in this appeal are: *United States ex rel. CIMZNHCA v. UCB, Inc.*, 970 F.3d 835, 852, 854 (7th Cir. 2020) (remanding and instructing the district court to dismiss the case on the government's motion and stating that "[w]herever the limits of the government's power lie, this case is not close to them"), *remanded to* No. 3:17-CV-765 (S.D. Ill. Sept. 28, 2020), *cert. denied*, No. 20-1138, 2021 WL 2637991 (June 28, 2021); *United States ex rel. SMSPF, LLC v. EMD Serono, Inc.*, 370 F. Supp. 3d. 483, 491 (E.D. Pa. 2019) (granting government's motion to dismiss); *United States ex rel. NHCA-TEV, LLC v. Teva Pharm. Prods. Ltd.*, No. 17-CV-2040, 2019 WL 6327207, at *6 (E.D. Pa. Nov. 26, 2019) (granting government's motion to dismiss); *United States ex rel. SAPF, LLC v. Amgen, Inc.*, No. 16-CV-5203 (E.D. Pa. Feb. 11, 2019) (dismissing case on voluntary consent of the government and relators); *United States ex rel. SCEF, LLC v. AstraZeneca PLC*, No. 17-CV-1328, 2019 WL 5725182, at *4 (W.D. Wash. Nov. 5, 2019) (granting government's motion to dismiss); *United States ex rel. Miller v. AbbVie, Inc.*, No. 16-CV-2111 (N.D. Tex. May 09, 2019) (dismissing case on voluntary consent of relator and the government); *United States ex rel. Carle v. Otsuka Holdings Co.*, No. 17-CV-966 (N.D. Ill. Jan. 29, 2019) (dismissing case on voluntary consent of the government and relators); *United States ex rel. SMSF, LLC v. Biogen, Inc.*, No. 16-CV-11379 (D. Mass. Dec. 17, 2018) (granting defendant's unopposed motion to dismiss for failure to state a claim); *United States ex rel. Health Choice Advocates, LLC v. Gilead, et al.*, No. 5:17-CV-121 (E.D. Tex. July 27, 2018) (dismissing case on voluntary consent of relator and the government).

in the United States District Court for the Eastern District of Texas.[2] Prior to filing these complaints, Health Choice submitted pre-filing notices to and met with attorneys from the United States Attorney's Office for the Eastern District of Texas. After filing the complaints, Health Choice met with officials at the Department of Justice Civil Division in Washington, D.C. The United States declined to intervene in either case.

Health Choice then amended each of its complaints. Shortly thereafter, Eli Lilly, Bayer, and the other defendants filed motions to dismiss for failure to state a claim. *See* Fed. R. Civ. P. 9(b), 12(b)(6). The magistrate judge held a consolidated hearing on the motions to dismiss in both cases. The magistrate judge recommended the motions be denied in part and granted in part, and the district court adopted these recommendations. Health Choice amended its complaints once more to address the pleading deficiencies identified by the district court.

In October of 2018, approximately a year after declining to intervene in the Eli Lilly and Bayer cases, the government sent notice to Health Choice that it intended to move to dismiss the complaints. *See* 31 U.S.C. § 3730(c)(2)(A). Over the next two-and-a-half months, Health Choice and the government conferred by meeting, letter, and teleconference to discuss the government's stated concerns about the case. During a teleconference with Health Choice, the government identified four specific concerns about

---

[2] In its negotiations with the government, Health Choice agreed to voluntarily dismiss its claims against the non-pharmaceutical defendants in the Eli Lilly case in order to "streamline" the case and reduce the administrative burden on the government. In January of 2019, Health Choice dismissed its claims, without prejudice, against all the defendants except Eli Lilly in the Eli Lilly case. Health Choice did not voluntarily dismiss any claims in the Bayer case. Amgen, Inc., Onyx Pharmaceuticals, Inc., AmerisourceBergen Corp., and Lash Group remain codefendants in the Bayer case. For simplicity, we refer only to Eli Lilly and Bayer.

the Eli Lilly and Bayer cases: "(1) whether there [was] sufficient factual and legal support to prove violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (AKS); (2) the substantial costs and burdens for the United States if the *qui tam* actions were to continue; (3) certain policy interests of Medicare and other federal healthcare programs; and (4) the investigative methods employed by 'National Healthcare Analysis Group,'" Health Choice's parent organization.

On December 17, 2018, the government notified Health Choice that it intended to proceed with its motions to dismiss, and it filed those motions the same day. In its notice to Health Choice, the government cited to its own two-year investigation and the supplemental information provided by Health Choice—including documents purportedly supporting Health Choice's theory of the cases and letters from Health Choice concerning the merits and costs and benefits of the cases—as the basis of its decision to seek dismissal.

In response to the government's motions to dismiss, Health Choice first asserted that the government supported its motions primarily with "*ad hominem* attacks" against Health Choice. Health choice then argued that the district court should not afford the government unfettered discretion to dismiss and instead should hold that the government has not made the "proper showing" to warrant dismissal.

In reply, the government said it had "concluded that, not only do the allegations lack factual and legal support, but further litigation will impose burdens and costs on the government that are not justified and will undermine practices that benefit federal healthcare programs by providing patients with greater access to product education and support."

On May 14, 2018, the magistrate judge held a consolidated hearing on the government's motions to dismiss both cases. The magistrate judge recommended that the district court grant both motions. The district court

adopted the recommendations and granted the government's motions to dismiss.  Health Choice timely appealed.

## II.

Before turning to the merits, we must determine whether we have jurisdiction to hear this case.  The district court had federal question jurisdiction over Health Choice's federal claims and supplemental jurisdiction over its state law claims.  *See* 28 U.S.C. §§ 1331, 1367(a).  Both Health Choice and the United States contend that appellate jurisdiction exists because the orders below are "final decisions" of the district court.  12 U.S.C. § 1291.  Still, we have an independent obligation to assure ourselves of jurisdiction. *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 468 (5th Cir. 2020) (*en banc*).

We have "jurisdiction of appeals from all final decisions of the district courts of the United States."  28 U.S.C. § 1291. "[T]here is no final decision if a plaintiff voluntarily dismisses a defendant without prejudice, because the plaintiff 'is entitled to bring a later suit on the same cause of action.'" *Williams v. Taylor Seidenbach, Inc.*, 958 F.3d 341, 343 (5th Cir. 2020) (*en banc*) (quoting *Ryan v. Occidental Petroleum Corp.*, 577 F.2d 298, 302 (5th Cir. 1978)).  "And in a suit against multiple defendants, there is no final decision as to one defendant until there is a final decision as to all defendants." *Id.*; *see* Fed. R. Civ. P. 54(b).

There is a potential jurisdictional issue concerning the chronology of two events: the plaintiff's voluntary dismissal and the district court's granting of a motion to dismiss.  Health Choice voluntarily dismissed, without prejudice, its claims against certain defendants in the lawsuit against Eli Lilly.  Eight months later, the district court granted the United States' motion to dismiss and entered final judgment.  This circuit has not decided how the finality rule of "*Williams* and *Ryan* would apply where the

[voluntary, without-prejudice] dismissal occurred before the adverse, interlocutory order." *Firefighters' Ret. Sys. v. Citco Grp. Ltd.*, 963 F.3d 491, 492 n.1 (5th Cir. 2020). This case squarely presents that question. We decline to create a circuit split and conclude that the prior without-prejudice dismissals did not deprive the district court's subsequent decision of finality. *See Schoenfeld v. Babbitt*, 168 F.3d 1257, 1265–66 (11th Cir. 1999) (holding that this sequence of events results in a final decision).

Unlike *Ryan*, this case involves a final decision. In *Ryan*, the district court granted a motion to dismiss certain paragraphs of plaintiff's complaint against the lone defendant. *See Ryan*, 577 F.2d at 300. Then, the plaintiff voluntarily dismissed without prejudice the remaining substantive allegation and requested certification under Federal Rule of Civil Procedure 54(b). This court saw the plaintiff's actions for what they were: a transparent attempt to obtain immediate appellate review over rulings that did "not amount to a termination of the litigation between the parties." *Id.* at 302. This case, by contrast, involves the plaintiff dismissing all claims against certain defendants "without prejudice before the district court entered the order [granting the government's motion to dismiss] and entered a final judgment." *See Schoenfeld*, 168 F.3d at 1265. Instead of manufacturing an appealable decision like the plaintiff in *Ryan*, Health Choice's dismissal brought about a swifter termination of the litigation.

The district court's order on the motion to dismiss was final because it "adjudicated all the claims against all the remaining parties in the action at the time it was entered." *Id.* at 1266; *cf. Cook v. City of Tyler*, 974 F.3d 537, 539 (5th Cir. 2020) ("For purposes of Section 1291 a decision is final only if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" (quoting *Sealed Appellant 1 v. Sealed Appellee*, 199 F.3d 276, 278 (5th Cir. 2000))). The prior voluntary dismissal does not alter that conclusion.

### III.

Satisfied that we have appellate jurisdiction, we now turn to the merits of Health Choice's appeal.

Health Choice brought its Anti-Kickback claims against Eli Lilly and Bayer on behalf of the government under the False Claims Act. 31 U.S.C. § 3730(b); 42 U.S.C. § 1320a-7b(b). The False Claims Act states that "[a] person may bring a civil action for a violation of [31 U.S.C. §] 3729 for the person and for the United States Government. The action shall be brought in the name of the Government." 31 U.S.C. § 3730(b). This provision authorizes individuals—relators—to bring *qui tam* lawsuits alleging a "false or fraudulent claim" for payment from the United States. *Id.* §§ 3729(a), 3730(b); *United States ex rel. Spicer v. Westbrook*, 751 F.3d 354, 364 (5th Cir. 2014). Relators are entitled to a portion of the proceeds from a successful *qui tam* lawsuit.[3] 31 U.S.C. § 3730(d).

The Anti-Kickback Statute proscribes "offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(A). Health Choice alleges that Eli Lilly and Bayer illegally provided free product-education services from nurses in order to induce health care providers to prescribe Eli Lilly and Bayer products. The Anti-Kickback Statute makes such an allegation actionable by a *qui tam* relator by defining a violation of

---

[3] Amicus curiae, the Chamber of Commerce, criticizes the False Claims Act for incentivizing relators to bring *qui tam* lawsuits by offering them a portion of the recovery. Such a policy objection to Congress's chosen incentive structure is irrelevant to our construction of the statute. *See Tolbert v. RBC Capital Markets Corp.*, 758 F.3d 619, 627 n.6 (5th Cir. 2014) ("We decline, however, to engage in any policy debate that would affect how we interpret this statute.").

§ 1320a-7b as a "false or fraudulent claim for purposes of" the False Claims Act. *Id*. § 1320a-7b(g). Thus, Health Choice's Anti-Kickback Statute claims are properly brought on behalf of the United States under the False Claims Act.

In this case, as with every False Claims Act *qui tam* lawsuit, the "real party in interest" is the United States. 31 U.S.C. § 3730(c)(2)(A); *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 930 (2009) (describing the United States as the "real party in interest" in any False Claims Act lawsuit). The claims here ultimately belong to the United States, not Health Choice. *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000) (regarding the False Claims Act as "effecting a partial assignment of the Government's damages claim"). The False Claims Act allows the government to assert control over *qui tam* litigation through a number of procedural mechanisms, such as intervention, settlement, and "[t]he power to veto voluntary settlements." *Searcy v. Philips Elecs. N. Am. Corp.*, 117 F.3d 154, 160 (5th Cir. 1997); *accord* 31 U.S.C. § 3730(c).

The government moved to dismiss Health Choice's claims in the Eli Lilly and Bayer cases, and the district court granted both motions. Health Choice challenges the dismissals on appeal. To address Health Choice's arguments, first, we lay out the tests other circuits have adopted to assess a motion by the government to dismiss a *qui tam* action. Second, we construe the term "hearing" in 31 U.S.C. § 3730(c)(2)(A) to require something more than a forum for a relator to convince the government not to dismiss. Third, we determine that Health Choice got a hearing as required by § 3730(c)(2)(A). And fourth, we conclude that dismissal of the Eli Lilly and Bayer cases was proper even under the test most favorable to Health Choice.

### A.

At oral argument, Health Choice focused mainly on the hearing requirement attendant to the government's right to "dismiss the action notwithstanding the objections of the person initiating the action." 31 U.S.C. § 3730(c)(2)(A). The government may move to dismiss once two conditions have been met. *Id.* First, the government must give notice to the *qui tam* relator of the government's motion to dismiss; second, the court must provide the relator with "an opportunity for a hearing on the motion." *Id.*

Health Choice argues that the district court erred by not affording it an evidentiary hearing before dismissing both cases. Health Choice further contends that a hearing necessarily entails the exercise of judicial power, and so the district court must engage is some meaningful review of the government's decision to dismiss.

We have not yet had an opportunity to determine what is required for the government to dismiss a case under § 3730. Four other circuits, however, have done so, and there is a deeply entrenched circuit split. *Compare Swift v. United States*, 318 F.3d 250, 252 (D.C. Cir. 2003) (giving the government unfettered discretion to dismiss *qui tam* lawsuits), *with United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145 (9th Cir. 1998) (adopting a rational-relation test for reviewing the government's motion to dismiss a *qui tam* lawsuit), *and Ridenour v. Kaiser-Hill Co.*, 397 F.3d 925, 936 (10th Cir. 2005) (adopting *Sequoia Orange*'s rational-relation test). *But see United States ex rel. CIMZNHCA v. UCB, Inc.*, 970 F.3d 835, 839 (7th Cir. 2020) (viewing the "choice between the competing standards as a false

one" and applying a standard "informed by Federal Rule of Civil Procedure 41").[4]

In *Swift*, the D.C. Circuit read § 3730(c)(2)(A) as "giv[ing] the government an unfettered right to dismiss an action" brought by a relator under the False Claims Act. *Swift*, 318 F.3d at 252. "The section states that 'The Government'—meaning the Executive Branch, not the Judicial—'may dismiss the action." *Id.* (quoting 31 U.S.C. § 3730(c)(2)(A)). The D.C. Circuit read no intent to create judicial review in § 3730(c)(2)(A). *Id.* Nor did the D.C. Circuit credit the relator's argument that a relator's "right to a hearing" gives the judiciary authority to review the government's decision to dismiss. *Id.* at 253. A § 3730(c)(2)(A) hearing, according to *Swift*, is simply "a formal opportunity to convince the government not to end the case," and possibly to establish fraud on the court. *Id.* *Swift* gives the government nearly unfettered discretion to dismiss a False Claims Act *qui tam* action.

Conversely, *Sequoia Orange* articulates a rational-relation test to scrutinize motions to dismiss filed by the government. Recognizing that "[t]he qui tam statute itself does not create a particular standard for dismissal," the Ninth Circuit approved of the "two step" burden-shifting test applied by the district court in that case. *Sequoia Orange Co.*, 151 F.3d at 1145. First, the government must identify: (1) "a valid government purpose"; and (2) "a rational relation between dismissal and accomplishment of that purpose." *Id.* Second, if the government satisfies its burden, "the burden switches to the relator 'to demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal.'" *Id.* (quoting *United States*

---

[4] *UCB* is one of the eleven cases brought by entities affiliated with Health Choice. *See supra* note 1 and accompanying text. The Seventh Circuit decided *UCB* after initial briefing and oral argument in this case. Both parties submitted supplemental letters to address *UCB*. *See* Fed. R. App. P. 28(j).

*ex rel. Sequoia Orange Co. v. Sunland Packing House Co.*, 912 F.Supp. 1325, 1347 (E.D. Cal. 1995)).

The Tenth Circuit adopted this rational-relation test from *Sequoia Orange* because it "construe[d] the hearing language of § 3730(c)(2)(A) to impart more substantive rights for a relator" than the D.C. Circuit recognized in *Swift*. *Ridenour*, 397 F.3d at 935.

The Seventh Circuit has also weighed in on this issue, refusing to wholly adopt either the *Sequoia Orange* rational-relation test or the unfettered-discretion standard from *Swift*, criticizing both. *UCB*, 970 F.3d at 839, 850, 853. Instead, the Seventh Circuit treated the government's motion to dismiss as a motion to intervene and then "appl[ied] a standard for dismissal informed by Federal Rule of Civil Procedure 41." *Id.* at 839. The Seventh Circuit used the phrase "[s]ubject to . . . any applicable federal statute" to apply § 3730(c)(2)(A) to the government's motion. *Id.* at 850 (quoting Fed. R. Civ. P. 41(a)(1)(A)). The Seventh Circuit concluded that the government has an "absolute" right to dismiss, so long as it serves notice under Rule 41(a) and there is a hearing under § 3730(c)(2)(A). *Id.* at 849–50. Because there is no dispute in this case that Health Choice received notice of the government's motion to dismiss, application of the Seventh Circuit's approach reduces to the question of whether Health Choice "took its opportunity to be heard." *Id.* at 850.

Health Choice urges us to adopt the rational-relation test from *Sequoia Orange* and argues that the district court erred in dismissing the Eli Lilly and Bayer cases. In doing so, however, it focuses on the relator's burden and insists that the *Sequoia Orange* test "marches under the banner of arbitrary and capricious review, a foundational limitation on government action." The government, conversely, urges us to adopt the unfettered discretion standard from *Swift* and argues that both the Eli Lilly and Bayer cases were properly

No. 19-40906

dismissed.  Alternatively, the government contends that the district court was correct in concluding that the government satisfied both the unfettered-discretion standard from *Swift* and the more burdensome *Sequoia Orange* standard.

## B.

The meaning of the term "hearing" holds the key to the question of the court's role in assessing the government's decision to dismiss under § 3730(c)(2)(A).  Because this is a question of statutory interpretation, our review is *de novo*.  *See Dresser v. Meba Medical & Benefits Plan*, 628 F.3d 705, 708 (5th Cir. 2010).  We are persuaded by Health Choice's argument that the term "hearing" means what is says.  It includes judicial involvement and action.

Congress introduced the hearing requirement in § 3730(c)(2)(A) in 1986.  False Claims Amendments Act of 1986, P.L. 99-562, 100 Stat. 3153. The fifth edition of *Black's Law Dictionary* gives the primary definition of "hearing" as a "[p]roceeding of relative formality . . . , generally public, *with definite issues of fact or law to be tried*, in which witnesses are heard and parties proceeded against have right to be heard, . . . and may terminate in final order."  *Hearing, Black's Law Dictionary* (5th ed. 1979) (emphasis added). Similarly, the tenth edition of *Merriam-Webster's Collegiate Dictionary* defines "hearing" in the relevant legal sense as "a listening to *arguments*."  Hearing, *Merriam-Webster's Collegiate Dictionary* (10th ed. 1993); *see also* Hearing *Webster's Second International Dictionary* (1934) ("A listening to arguments or proofs and arguments in interlocutory proceeding.").[5]

---

[5] *See Antonin Scalia & Bryan A. Garner, *A Note on the Use of Dictionaries*, 16 Green Bag 2d 419, 423, 426, 427 (2013) ("Dictionaries tend to lag behind linguistic realities . . . .

The *Black's* definition hinges on the issues tried at the hearing, and the *Webster's* definition hinges on the argument or proofs presented at the hearing. Both definitions, then, necessarily involve something to be decided. These definitions cast doubt on the government's notion of a § 3730(c)(2)(A) hearing as merely an opportunity for the government to publicly broadcast its reasons for dismissal and for the relator to convince the government to change its mind. Such a limited notion of a hearing that leaves nothing for the court to decide or do is inconsistent with the notion that the function of federal courts is to decide actual cases and controversies. *Cf.* U.S. Const. art. III § 2; *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340–41 (2006). Simply put, courts do not exist to provide a forum for press announcements.

While some type of actual hearing is required, we need not decide the precise bounds of the government's discretion to dismiss *qui tam* lawsuits. *Cf. United States v. Gonzales*, 520 U.S. 1, 11 (1997) ("We are hesitant to reach beyond the facts of this case to decide a question that is not squarely presented for our review."). For the reasons explained below, it is clear that Health Choice had a hearing and that dismissal was, in the very least, not arbitrary and capricious.

## C.

At oral argument, counsel for Health Choice repeatedly stressed that there had been an absence of "an evidentiary hearing, as required by procedural due process" and § 3730(c)(2)(A). *See, e.g.*, Oral Argument at 1:45, 2:50. Health Choice thus states both statutory and constitutional bases for affording it an evidentiary hearing.

---

If you are seeking to ascertain the meaning of a term in an 1819 statute, it is generally quite permissible to consult an 1828 dictionary.").

Health Choice's statutory argument fails because a review of the record demonstrates that Health Choice did get a hearing, and the magistrate judge did not prevent Health Choice from presenting evidence at that hearing. Health Choice simply chose not to present its evidence.[6] Counsel for Health Choice admitted as much at oral argument:

> We said, "We are prepared to prove our case," but we felt, honestly . . . that there was no need for an evidentiary hearing because the government's affidavits and declarations had been thoroughly rebutted. But now that we are where we are we would like an evidentiary hearing to show that—
>
> . . . .
>
> I want to be very precise. We asked—We represented to the court we have John Mininno here prepared to testify. The magistrate judge did not respond at all. That was our submission. And why was that our submission? Because the fundamental thrust of the motion to dismiss was "NHCA [Health Choice's parent organization] is bad" and "NHCA" which is wrong . . . and the second thing that we said is the

---

[6] In that hearing, Health Choice split its argument into two parts, delivered by two different attorneys. In the first portion of its argument, Health Choice urged the magistrate judge to reject the D.C. Circuit's unfettered-discretion approach from *Swift* and instead adopt the rational-relation test from *Sequoia Orange* used by the Ninth and Tenth Circuits as the standard of review of the government's decision to dismiss. In the second portion of its argument, Health Choice asserted that the totality of the circumstances shows the government's decision to dismiss the Eli Lilly and Bayer cases was arbitrary and capricious.

Health Choice's standard-of-review argument at the hearing centered around the need for "an authentic and meaningful hearing with law to apply." Health Choice stressed at this hearing that "we want a hearing . . . and a meaningful hearing." Health Choice told the magistrate judge that a witness, John Mininno, was present at the hearing and that "[h]e's prepared to answer any questions that the Court might have, and the Court has the benefit of his declaration, which really is not contested by the Government." Health Choice, however, did not move to put John Mininno on the stand, nor did it offer any other evidence at the hearing. There is no indication in the record that the magistrate judge prevented Health Choice from examining John Mininno or presenting other evidence.

> Anti-Kickback statute is so vitally important and the challenge that was mounted in the motion to dismiss to our methodology with respect to interviewing witnesses is wrong. And the magistrate judge did not respond to that.
>
> . . . .
>
> I want to be very clear with the court. We did not say to the court in open court "We need an evidentiary hearing." But please don't suggest that in any way contemplates or suggests waiver. The government hasn't argued it, and if that is the case, then the government has waived a waiver argument.

Oral Argument at 7:55–8:15, 8:40–9:45, 11:00–20.

Waiver is not at issue in this case. Rather, the oral argument aptly demonstrates why there was no error here. Health Choice had a hearing before the magistrate judge.[7] It had a witness available to testify at that hearing, and the witness was not prohibited from testifying. Health Choice declined to call the witness to testify and the magistrate judge did not prevent Health Choice from presenting the witness. Health Choice's statements at oral argument suggest that it consciously and strategically chose not to offer evidence because it believed it had already won the motion. Oral Argument at 8:15–30. Even assuming that § 3730(c)(2)(A) requires the hearing to be an evidentiary hearing, there was no error because Health Choice declined to offer evidence at the hearing. *See Chang v. Child.'s Advoc. Ctr. of Del. Weih Steve Chang*, 938 F.3d 384, 387 (3d Cir. 2019) ("An 'opportunity for a hearing,' however, requires that relators avail themselves of the 'opportunity.'").

Health Choice's constitutional argument also fails. Health Choice argues that procedural due process entitled it to an evidentiary hearing, citing

---

[7] Health Choice does not argue that the hearing needed to be before the district court instead of the magistrate judge.

to *Hamdi v. Rumsfeld*, *Goldberg v. Kelly*, and *Thibodeaux v. Bordelon* for support.  Oral Argument at 6:10; 56:04; 542 U.S. 507 (2004); 397 U.S. 254 (1970); 740 F.2d 329 (5th Cir. 1984).  In Health Choice's view—and in its own words—"a *qui tam* relator surely should enjoy the modicum of protections asserted by a welfare benefits recipient." *Cf. Goldberg v. Kelly*, 397 U.S. 254 (1970).  Health Choice quotes *Vermont Agency of Natural Resources* for the proposition that "the [Anti-Kickback Statute] gives the relator himself an interest *in the lawsuit*, and not merely the right to retain a fee out of the recovery."  529 U.S. at 772.  Thus, on Health Choice's reasoning, the relator has a property interest in the lawsuit that is protected by procedural due process.

Even assuming that procedural due process requires an evidentiary hearing when the government seeks to terminate a *qui tam* lawsuit brought under the False Claims Act, Health Choice's procedural-due-process argument fails for the same reason that the statutory argument failed.  Health Choice had a hearing.  Health Choice brought a witness, John Mininno, to that hearing.  Health Choice simply chose not to call the witness or offer any other evidence.  To emphasize this point, it is worth repeating Health Choice's counsel's statement at oral argument: "[W]e felt, honestly . . . that there was no need for an evidentiary hearing because the government's affidavits and declarations had been thoroughly rebutted.  But now that we are where we are we would like an evidentiary hearing."  Oral Argument at 7:55–8:15.  Assuming *arguendo* that Health Choice had a property interest in the Eli Lilly and Bayer *qui tam* lawsuits, its property interests were adequately protected by the procedures in the district court.  There was no procedural-due-process error in this case.

D.

Finally, we consider Health Choice's argument that the government failed to satisfy its burden to dismiss under § 3730(c)(2)(A).  Assuming, without deciding, that *Sequoia Orange*'s more burdensome test applies,[8] we hold that dismissal was proper.

Under the *Sequoia Orange* test, the government must first show that there is: (1) "a valid government purpose; and (2) a rational relation between dismissal and accomplishment of that purpose."  *Sequoia Orange Co.*, 151 F.3d at 1145.  To show a rational relation, "there need not be a tight fitting relationship between [dismissal and the stated purpose]; it is enough that there are plausible, or arguable, reasons supporting the [decision to dismiss]."  *Ridenour*, 397 F.3d at 937 (quoting *Sequoia Orange Co.*, 912 F.Supp. at 1347 (E.D. Cal. 1995)); *see also Jackson Water Works, Inc. v. Pub. Util's Comm'n of the State of Cal.*, 793 F.2d 1090, 1094 (9th Cir. 1986).  If the government makes its showing, the burden shifts to the *qui tam* relator to show that "dismissal is fraudulent, arbitrary and capricious, or illegal."  *Sequoia Orange*, 151 F.3d at 1145 (quoting *Sequoia Orange Co.*, 912 F.Supp. at 1347 (E.D. Cal. 1995)).

1.

The government made its required showing.

The government offered two valid purposes to justify dismissal.  First, "the allegations . . . lack sufficient merit to justify the cost of investigation and prosecution."  Second, "further litigation . . . will undermine practices

---

[8] The magistrate judge in her reports and recommendations, and the district court in adopting the reports and recommendations, both assumed that *Sequioa Orange* should apply and determined that dismissal was proper even under that more burdensome standard.

that benefit federal healthcare programs by providing patients with greater access to product education and support."

Health Choice alleged violations spanning a six-year period involving Medicare, Medicaid, and TRICARE. For Medicare Part D alone, the Eli Lilly allegations involve more than 32,000,000 prescriptions, from more than 400,000 physicians, for more than 1,000,000 Medicare beneficiaries. Similarly, the Bayer allegations involve nearly 500,000 prescriptions, from more than 10,000 physicians, for "tens of thousands" of Medicare beneficiaries. According to the government, the scope of these allegations would impose "substantial litigation burdens" on the United States as it monitors the cases, responds to discovery requests, prepares agency employees for depositions, *et cetera*. The government has stated a legitimate government purpose in considering litigation costs. *See Sequoia Orange*, 151 F.3d at 1146.

The government has shown a rational relation between dismissal and its cost-saving purpose. The government concluded that the litigation costs were not justified by the expected value of recovery against Eli Lilly and Bayer, particularly given the government's concerns about the merit of the underlying allegations. It reasoned that its litigation expenses would not be recouped by pursuing the case further. In that sense, dismissal is rationally related to the purpose of avoiding litigation costs.

The government also asserted in the district court that the product education services provided by Eli Lilly and Bayer "benefit[ed] federal healthcare programs" and were lawful. According to the government, federal healthcare programs have a strong interest in ensuring that benefits recipients have access to education about their prescriptions. Further, the government had previously concluded in a different context that patient-education services alone do not constitute illegal remuneration. Thus, the

government concluded that the services provided by Eli Lilly and Bayer are not only beneficial but also lawful. Promoting beneficial and lawful programs is plainly a legitimate government interest. Dismissal is rationally related to that interest because it removes an impediment to providing those services. In short, the government has satisfied its burden of showing a rational relation between dismissal and legitimate government interests.

2.

Because the government made its required showing, the burden shifts to Health Choice to show that the government's motion to dismiss is "fraudulent, arbitrary and capricious, or illegal." *Sequoia Orange*, 151 F.3d at 1145 (quoting *Sequoia Orange Co.*, 912 F.Supp. at 1347 (E.D. Cal. 1995)). Health Choice does not meet this burden. Health Choice offers little more than unsupported allegations of animus against John Mininno and the National Health Care Analysis Group, Health Choice's parent organization, to support its assertion that dismissal is arbitrary and capricious. *See* Oral Argument at 9:30.

Health Choice devotes much of its opening brief to the government's interest in the National Health Care Analysis Group's corporate structure and its apparent misunderstanding of Health Choice's claims. The government's letter to Health Choice, its motion to dismiss, and its arguments before the magistrate judge, however, show that National Health Care Analysis Group's corporate structure played no part in the government's rationale for dismissal. Moreover, to support its claim of the government's apparent misunderstanding of its claims, Health Choice offers little more than a single question asked by a government attorney.

Health Choice further offers the conclusory assertion that the one-year time period between the government's declination notice and its notice of intent to dismiss amounted to arbitrary and capricious conduct. Health

Choice cites to a Department of Justice document, referred to as the "Granston Memo," to bolster this point. The memo states that "if one waits until the close of discovery or trial [to move to dismiss a *qui tam* lawsuit], there is a risk that the court may be less receptive to the request given the expenditure of resources by the court and parties." This guidance speaks to the risk that the court will deny the government's motion to dismiss. We cannot say that the government did not follow its own guidance when it decided to take a risk contemplated by that guidance.

Finally, Health Choice insists that dismissal was arbitrary and capricious because the government failed to conduct a cost–benefit analysis. This argument, however, fails to acknowledge the government's position that Health Choice's allegations "lack sufficient merit to justify the cost of investigation and prosecution." This is a cost–benefit analysis of sorts. As explained above, the government considered the expected benefit of Health Choice's lawsuit given the government's assessment of the merits of the case.

Considering Health Choice's arguments and the record as a whole, we hold that Health Choice did not show that dismissal was "fraudulent, arbitrary and capricious, or illegal" under the strict *Sequoia Orange* standard. *Cf. Chang*, 938 F.3d at 387 (determining that relator failed to establish fraud, arbitrariness and caprice, or illegality); *Ridenour*, 397 F.3d at 937–38 ("The district court correctly concluded the Relators failed to meet their burden to show the Government's motion to dismiss was fraudulent, arbitrary and capricious, or illegal.").

\*    \*    \*

For the reasons set forth above, the judgment of the district court is AFFIRMED.

No. 19-40906

Patrick E. Higginbotham, *Circuit Judge*, concurring:

While this appeal touches on an unsettled area of law, the outcome here is straightforward. Under Congress's qui tam regulatory scheme, the government may assume the prosecution of a claim filed by a relator with full control over its course, or it may allow the relator to press the claim alone.[1] Where, as here, the government follows the latter course but returns to the litigation at a later stage,[2] the government's control over its prosecution is less certain, including its authority to dismiss the case, and this uncertainty has divided our sister courts.

The hearing requirement in § 3730(c)(2)(A) evidences Congress's recognition of the relator's interest in qui tam claims hitherto pursued alone. While providing textual footing for judicial oversight of the government's decision to dismiss the case, it offers little more as to its scope. This silence leaves the content of the hearing to respond to the case before the court. At a minimum, the statute compels the government to stand in open court and state for the record the reasons for its judgment that the case should not proceed. While seemingly pro forma, this statutory requirement is not empty of force for it affords a measure of public accountability.

In this case, it suffices that the relator, through able counsel, had the opportunity to engage the government's stated reasons and did so without apparent restriction on its response, including its ability to put on evidence. In sum, it is not apparent that the district court could reasonably have denied the government's motion to dismiss the claims. While this want of control

---

[1] 31 U.S.C. §§ 3730(c)(1)-(5).

[2] We do not address whether the government may dismiss without formally intervening or whether the motion to dismiss should be treated as a motion to intervene, as the Seventh Circuit has held. *United States v. UCB, Inc.*, 970 F.3d 835, 849 (7th Cir. 2020). The distinction does not affect the outcome.

leaves a relator at risk, it signifies that the risk is inherent in pursuing litigation under this statutory scheme, which also offers the possibility of large returns. The government could have prevented the relators from being involved at the start; it could have said it was aware of, but never defrauded by, the practices alleged. The government did neither here, but when it chose to dismiss, it gave legitimate reasons for doing so, ones which sound mostly in policy choices, belonging to the political branches. On these facts, I agree that the statutory prerequisites for dismissal were satisfied.